# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LORI FORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:09-cv-0692-TWP-TAB |
| | ) | |
| CITY OF CRAWFORDSVILLE, | ) | |
| METROPOLITAN BOARD OF POLICE | ) | |
| COMMISSIONERS, JOHN ZUMER, | ) | |
| CHARLES COONS, KURT KNECHT, HAL | ) | |
| UTTERBACK, CARLOS GOODE, DAN | ) | |
| HOUSTON, ANDREW BIDDLE, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants' Motion for Summary Judgment. This dispute stems from Plaintiff Lori Ford's ("Plaintiff" or "Ford") rocky employment relationship with the Crawfordsville Police Department ("CPD"). In the fallout from this relationship, Plaintiff filed a complaint alleging eleven different claims, some against the City of Crawfordsville ("City"), some against the Metropolitan Board of Police Commissioners ("Board"), some against specific individuals ("Individual Defendants"),[1] and some against all of the above (collectively, "Defendants"). Plaintiff's complaint includes claims for sex discrimination, unlawful retaliation, disability discrimination, various violations of Section 1983, and a smattering of state law claims. For the reasons set forth below, Defendants' Motion for Summary Judgment [Dkt. 97] is **GRANTED** in its entirety. All other pending Motions [Dkt. 112

---

[1]The term "Individual Defendants" refers to John Zumer, Charles Coons, Kurt Knecht, Hal Utterback, Carlos Goode, Dan Houston, and Andrew Biddle.

and Dkt. 116]  are **DENIED** as Moot.

## I.  BACKGROUND

Ford began working as a patrol officer for CPD in 1986.  In 2001, she was promoted to detective and the rank of Sergeant.  She was selected over 8 to 10 other applicants for the detective position.  Prior to her promotion, Defendant Kurt Knecht ("Knecht") called Ford and encouraged her to apply for the position, even writing letters to the Chief of Police on her behalf. Knecht served as captain of the detectives until he was elevated to Chief of Police in 2004.

### A.     The First Lawsuit and the Settlement Agreement

Over time, Ford's relationship with the CPD deteriorated.  In fact, this is not the first legal spat between Ford and the City.  In 2005, Ford lodged an EEOC complaint after Knecht forbade her from moving to Avon, Indiana, purportedly because the distance between work and home would hobble her ability to respond to criminal activity in a timely fashion.  On February 20, 2007, Ford filed suit against the City in this Court, alleging gender discrimination, retaliation, and a hostile work environment arising out of her work at the CPD.  On July 25, 2007, the parties reached a settlement in principle, memorializing the terms of the agreement on a handwritten note.  Implementing these terms was not a seamless process, however.  According to Ford's testimony, at one point Hal Utterback, the Assistant Chief of Police and her direct supervisor ("Utterback"), told Ford "You will do what I tell you to do."  In any event, after some wrangling over the agreement's precise terms, Ford executed a formal, typewritten settlement agreement on November 23, 2007.  In the current action, Ford is not claiming damages based on any events occurring prior to the settlement of the first lawsuit.

Pursuant to the settlement agreement, the City agreed to pay Ford $10,000.00 and create

2

a new position for her, dubbed "Station Sergeant" – "a position of equal rank to her prior assignment with the detective division of the [CPD]." As Station Sergeant, Ford would work in the police station Monday through Friday from 8:00 a.m. to 4:00 p.m., completing a hodgepodge of duties, including: managing the evidence room, administering gun permits, administering the return of found property, and administering subpoena compliance. Further, Ford agreed "to retire upon reaching her date of retirement, on or before December 31, 2010." As a term of the agreement, Ford handpicked Utterback to serve as her direct supervisor. However, during her deposition, Ford acknowledged that Knecht, as Chief of Police, was still her superior and in her chain of command.

**B.    Ford's Return to CPD**

Following settlement, Ford returned to work August 2, 2007. The very next day, August 3, 2007, Ford presented the CPD with a note from her doctor placing her on intermittent medical leave due to stomach problems. In her deposition, Ford testified, "once I realized that a federal court settlement meant nothing, I started throwing up again. . . [a]nd the only relief that I would ever get from the physical symptoms. . . was to be away from it." Subsequently, Ford took time off on an as-needed basis. During her deposition, Ford testified that none of the Defendants ever raised an issue with her intermittent leave.

To the extent the settlement fostered any comity between the parties, it quickly evaporated. In her deposition, Ford testified that following her return to CPD, Knecht regularly glared at her and spread lies about her, although she did not elaborate on the nature of the alleged lies. On October 12, 2007, Ford met with the Mayor of Crawfordsville, Charlie Coons ("Mayor Coons"), to apprise him of her job duties and, more generally, how things were going. At his

deposition, Mayor Coons described the meeting as "an informational meeting." According to

Ford's testimony, she voiced some concerns about harassment during this meeting. The record,

however, is unclear as to the precise nature of these concerns.

## C. The Incident and the Aftermath

Prior to December 7, 2007, Ford had a spotless record in terms of discipline. On Friday

December 7, 2007, that changed when Ford and Knecht's relationship reached a boiling point.

Ford was talking on her cell phone with her friend Missy Cosby ("Cosby") in her office with the

door open. Cosby was upset because she had just been fired from her job. Referring to Knecht

(but not using his name), Ford stated to Cosby, "you run into him twice in the last couple weeks.

. . [n]ext thing you know, you get fired." As fate would have it, Knecht was walking past Ford's

office and overheard the comment. Knecht confronted Ford, asking if she had insinuated that he

was responsible for getting someone fired. The situation quickly devolved into an uncivil

shouting match. Ford told Knecht that "he needed to leave me the fuck alone." Knecht

responded by pounding his chest and shouting, "I am the chief of police." Ford then stood up

and stated "[y]ou lost your authority over me" and "you [can] take it up with the attorneys." The

dustup ended with Knecht storming out of Ford's office.

Immediately after the incident, Utterback interviewed Ford and sent her home for the

day. That same day, Utterback and Knecht met with Mayor Coons, arriving at his office

unannounced. At his deposition, Mayor Coons testified that at this meeting, Knecht was upset

and "requested that [Ford] be terminated." On Monday December 10, 2007, Utterback informed

Ford that she was suspended for 5 days – including the day of the actual incident – *with* pay.

According to Utterback, prior to the incident, no CPD officer had ever received a paid

suspension. At her deposition, Ford conceded that it is important to respect higher-ranking officers in order to "keep the peace." Nevertheless, Ford testified that she and Knecht should have received an equal punishment for the verbal skirmish.

By way of a December 13, 2007 letter, Utterback informed Ford that he had referred her to undergo a fitness for duty evaluation and, assuming she passed the evaluation, she would be suspended for 5 days *without* pay due to the incident. The letter continued, "At the conclusion of the suspension, you would return to duty with no further punishment resulting from the incident." Utterback wrote that this course of action was "fair and reasonable" because "[s]ome sanction beyond paid time off is merited by your actions on December 7, 2007, and I must ascertain your fitness for continued duty." At his deposition, Utterback testified that, in particular, the psychological evaluation was warranted based on the incident itself, Ford's post-incident interview, Ford's expressed concern that her office was bugged, and Utterback's knowledge that Ford had followed and videotaped Knecht after a Christmas party. The letter also clarified, "This leave is not in the nature of a suspension or punishment and will be with full pay and benefits, including insurance and any fringe benefits to which you are now entitled." Thus, beginning December 14, 2007, Ford went on paid administrative leave until the completion of her evaluation. On December 18, 2007, Ford lodged a complaint with the EEOC.

Ford underwent an evaluation on January 4, 2008 with a third party. Within days, Utterback called Ford to inform her that she had been deemed fit for duty. However, Utterback also told Ford that she should not return to work until the Board held a formal hearing regarding Ford's insubordination. Ford had appealed her discipline to the Board and requested a hearing to "discuss the punishment I was receiving." On January 22, 2008, the Board held its hearing.

5

There, Utterback testified that Knecht wanted Ford to receive the harshest punishment available – "anything and everything to be done to [Ford]" – within the confines of the law. After the hearing, the Board issued findings of fact, which noted that Ford "has yet to receive any unpaid suspension." The Board determined that Ford's conduct warranted a 3-day unpaid suspension, spanning January 23, 2008 to January 25, 2008. Thus, the Board reduced Ford's unpaid suspension from 5 days to 3 days.

This suspension effectively ended Ford's employment with the CPD. She never returned to work, claiming "I had no work environment to return to" and "[I] was tired of being scared every single day." After taking paid leave from February through May 2008, during which time Ford's efforts to secure a "safe environment" purportedly proved futile, Ford tendered her letter of resignation on May 30, 2008. In the letter, Ford notified the City that she would use FMLA leave and vacation time until June 27, 2008, which would be the effective date of her resignation. Ford's resignation letter cited the CPD's "hostile work environment." According to Ford, continuing to work in such a toxic environment "would be extremely detrimental to my physical health and emotional well being." On September 16, 2008, Ford served her Tort Claim Notice. Additional facts are added below as needed.

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews

"the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

### III. DISCUSSION

**A.    Evidentiary Issues**

As an initial matter, the Court must touch on two technical arguments raised by Defendants. First, through their reply brief, Defendants move to strike Plaintiff's belatedly-filed evidence. Plaintiff's response brief was initially due December 28, 2010. On two occasions, the Court granted Plaintiff's Motion for Enlargement of Time, extending the due date to January 5, 2011. Plaintiff met this deadline for the brief itself but, due to some technological hiccups, failed to file supporting evidence in a timely fashion, waiting until January 7, 2011. Defendants argue that this blunder warrants striking Plaintiff's evidence. Second, Defendants contend that their "Statement of Material Facts not in Dispute" must be properly admitted to exist without

controversy due to Plaintiff's failure to comply with Local Rule 56.1(b).

Defendants' arguments (particularly the first argument) are well-taken. Practically, however, these arguments are not game-changers. Given that the Court – considering *all* of the filed evidence – finds that Defendants must prevail on the merits, neither technical argument needs to be considered in detail.

**B.      Sex Discrimination Claim against the City and the Board**

Under Title VII, it is well-established that a plaintiff may prove discrimination in one of two ways: either (1) through direct evidence, or (2) indirectly through the burden shifting mechanism of *McDonnell Douglas*. *See Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000) (citation omitted). Ford proceeds under the burden-shifting indirect method for her sex discrimination claim.[2] Under this framework, a plaintiff must first establish a *prima facie* case of discrimination based on sex. *Id*. (citation omitted). Once that is established, the burden shifts to the defendant to provide a legitimate non-discriminatory reason for the action. *Id*. (citation omitted). If defendant meets that burden, then the burden shifts back to plaintiff to establish that the reasons proffered by the defendant were mere pretext. *Id*. (citation omitted).

To make a *prima facie* case, Ford must demonstrate that: (1) she is a member of a protected class; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably compared to similarly situated employees outside of the protected class. *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d

---

[2]It is unclear if Ford also attempts to proceed under the direct method. Regardless, such an effort would be unavailing. Her direct evidence is non-existent and her circumstantial evidence is far too remote and insubstantial to permit a rational trier of fact to find direct discrimination.

357, 364 (7th Cir. 2009) (citation omitted).  Defendants do not seriously dispute elements (1), (2), and (3).  Element (4), by contrast, is hotly contested.  Specifically, Defendants argue that Ford cannot possibly point to a similarly situated male employee who was treated more favorably.

Ford makes four basic arguments to bolster the similarly situated element of her *prima facie* case.  First, Ford highlights that she was disciplined for using words that were common parlance in her work environment.  Indeed, in the CPD, foul language was pervasive. Among some employees, words such as "fuck" and "dumbass" were par for the course.  Second, Ford notes that Knecht and Utterback's decision to meet with Mayor Coons prior to disciplining Ford was unprecedented.  Third, Ford contends that male officers who engaged in worse conduct received more lenient punishments.  Specifically, Ford emphasizes that Officer Harvey Barton and Officer Jason Spires "were given four days unpaid suspension" for "conduct unbecoming an officer for engaging in ghost employment."[3] [Dkt. 106 at 27].  Fourth, Ford points out that Knecht was not disciplined for the incident in question.

These arguments are well-taken but, in the end, the Court is not persuaded.  First, Ford's foul language rationale rings particularly hollow, as it ignores the fact that Ford cussed out her *superior* and *denied his authority*.  Such behavior clearly shows disrespect, erodes morale, and disregards a well-established chain of command.  In this way, Ford's conduct was far more troubling than that of a CPD employee who tosses around distasteful language in casual conversation.  During her deposition, Ford admitted that she cursed when speaking

---

[3]The parties did not specifically define "ghost employment."  The Court understands it to be a dishonest practice that involves shirking responsibility or working on things outside of your job duties while on the clock and getting paid.

conversationally: "We all did. . . [i]t was everyday wording."

Second, the meeting with Mayor Coons may have been unprecedented, but *different* treatment does not necessarily equate to *less favorable* treatment, and the latter is the operative requirement for making out a *prima facie* case. Plus, as a practical matter, the meeting with Mayor Coons was a natural response given the liability concerns at play. Ford had, after all, filed a previous lawsuit. When asked at his deposition why Mayor Coons became involved, Utterback responded:

> We had just come out of a litigation with her. The city got sued, not just the police department, the entire city. So we wanted to get on the same page with everyone. This is what we are doing. We want to do things right. We want to follow the rules that we need to follow to make sure we are doing everything right or we would end up in litigation again and here we are.

Third, Ford's argument that Knecht was not disciplined for the incident in question fares no better. After all, this argument turns a blind eye to the fact that Knecht was Ford's superior. For this reason, what Ford said to Knecht ("leave me the fuck alone" and "you have no authority over me") is far different and far worse than what Knecht said to Ford ("I am the Chief of Police"). Ford's coarse, aggressive language notwithstanding, she overtly defied her chain of command. The notion that Knecht and Ford are entitled to equal punishment for the incident is, quite frankly, hard to fathom.

Ford's strongest rationale – specific male officers that behaved worse were treated more favorably – demands a more rigorous analysis. To buttress her claim, Ford argues that ghost employment is worse than cussing out a superior and, logically following, Ford's punishment did not fit her crime in light of the punishment received by similarly situated male officers. Further, Ford trumpets Knecht's testimony that Ford and Officer Barton's offenses were "equally

serious." In doing so, she implies that this assertion is patently false.

Once again, the Court is not persuaded. "Whether two employees are 'similarly situated' is a common sense inquiry that depends on the employment context." *Filar v. Board of Educ. of City of Chicago*, 526 F.3d 1054, 1061 (7th Cir. 2008). "To make this showing, a plaintiff need not present a doppelganger who differs only by having remained in the employer's good graces." *Id*. Nevertheless, similarly situated employees must be directly comparable in "all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (citation omitted). To prove this element, Ford must demonstrate that her male counterparts occupied the same job level and engaged in similar past misconduct but were nonetheless subject to more favorable disciplinary action. *Jordan v. City of Gary, Ind.*, 396 F.3d 825, 834 (7th Cir. 2005); *see also Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 479 (7th Cir. 2010) ("When a plaintiff claims to have been disciplined more harshly than other, similarly situated employees based on a prohibited reason, the plaintiff typically must demonstrate that the other employees engaged in *similar conduct* without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.") (emphasis added; citation and internal quotations omitted).

Plainly stated, Ford cannot show that any of her male counterparts engaged in *similar conduct* – that is, insubordination toward a superior officer in cursing at that officer and denying his authority. Ghost employment and cussing out a superior are both wrong, but for purposes of making a *prima facie* case, they are apples and oranges. On this point, *Kivett v. Marion County Sheriff's Dept.*, No. 1:05-cv-348-JDT-TAB, 2007 WL 906470 (S.D. Ind. Mar. 22, 2007) is instructive. In *Kivett*, a female sergeant was fired after she released an inmate who should have

been returned to prison. *Id*. at *1.  The plaintiff filed a Title VII discrimination suit, highlighting that a male counterpart received a considerably more lenient punishment for virtually identical mistakes. *Id*. at *18.  Even though the plaintiff and the male officer were similar in many relevant respects, the Court still ruled that they were not similarly situated. *Id*. at *19.  In making its determination, the Court emphasized that unlike her male counterpart, the plaintiff had lied to her superiors. *Id*.  Thus, despite the ostensibly identical mistakes, the plaintiff was not similarly situated to the male officer, because only she had been untruthful. *Id*.  Here, Ford cannot point to any male who engaged in remotely similar conduct.  For this reason, Ford cannot establish a *prima facie* case and summary judgment for the City on Ford's sex discrimination claim is **GRANTED**.[4]

## C.    Retaliation Claim against the City and the Board

In addition to protecting persons from certain forms of job discrimination, Title VII forbids retaliation against an employee because that employee "has opposed any practice made an unlawful employment practice" by Title VII or "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a).  The plaintiff may prove retaliation under the direct or indirect method. *Metzger v. Illinois State Police*, 519 F.3d 677, 681 (7th Cir. 2008) (citation omitted).  Ford

---

[4]Assuming *arguendo* that Ford could establish a *prima facie* case, the *McDonnell Douglas* analysis continues.  In proceeding, Ford would invariably run into impenetrable roadblocks when attempting to establish that the legitimate non-discriminatory reason for her discipline was pretext.  After all, Ford admits cussing out Knecht and denying his authority. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (the court does "not sit as a super personnel review board that second-guesses an employer's facially legitimate business decisions. . . [r]ather, we ask only whether the employer's explanation was honestly believed.").  However, given the Court's ruling, it need not address this issue in detail.

attempts to survive summary judgment using both methods, each of which is examined in turn below.

### 1.    Indirect Method

To make a *prima facie* case of retaliation under the indirect method, the plaintiff must show: (1) she engaged in statutorily protected activity; (2) she met her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably compared to similarly situated employees who did not engage in statutorily protected activity. *See Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 785 (7th Cir. 2007).  Central to this dispute, the Seventh Circuit has repeatedly cautioned that an employee's complaint of discrimination does not immunize her from being subsequently disciplined for inappropriate workplace conduct. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002).

Ford's retaliation claim under the indirect method fails for the same reason that her sex discrimination claim fails – she did not show that a similarly situated employee received more favorable treatment. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) (affirming summary judgment on retaliation claim; plaintiff could not make out prima facie case because she could not identify an employee who engaged in comparable misconduct); *see also Nichols*, 510 F.3d at 786 (same).  For this reason, Ford's attempt to survive summary judgment under the indirect method of proof hits a dead-end.[5]

### 2.    Direct Method

Ford also argues that she can avoid summary judgment under the direct method of proof.

_____

[5]Even if Ford had managed to establish a *prima facie* case, her retaliation claim would still flounder under the indirect method, because she cannot show that the City's proffered justification for her punishment was pretext for retaliation.

Under the direct method, the plaintiff must present evidence, direct or circumstantial, demonstrating that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the two. *Metzger*, 519 F.3d at 681. "Evidence of retaliation is 'direct' when, if believed, it would prove the fact in question without reliance on inference or presumption." *Mannie v. Potter*, 394 F.3d 977, 983 (7th Cir. 2005) (citation omitted). If plaintiff does not have direct evidence, she may nevertheless succeed under the direct method if she can muster circumstantial evidence showing the requisite causal link between her complaint and the subsequent adverse employment action. *See Argyropoulos*, 539 F.3d at 734. Timing is often a key piece of circumstantial evidence. Generally, the more time that passes between the protected activity and the adverse action, the less likely that there exists a causal link between the two events. *See, e.g., Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003) (one-year delay between protected activity and termination was "far too long. . . to allow a reasonable fact-finder to infer that her termination was causally related to the filing of her complaint."); *Argyropoulos*, 539 F.3d at 734 ("The approximate seven-week interval between [plaintiff's] sexual harassment complaint and her subsequent [adverse employment action] does not represent that rare case where suspicious timing, without more, will carry the day."); *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 398-99 (7th Cir. 1999) (four months negated causal inference); *Davidson v. Midelfort Clinic*, 133 F.3d 499, 511 (7th Cir. 1998) (no causal inference where employee was terminated five months after filing EEOC complaint).

Ford can easily establish element (1), given that she clearly engaged in statutorily protected behavior. She can also easily establish element (2). She suffered an adverse employment action in the form of a suspension and, in her mind (and as will be discussed

below), a constructive discharge. However, element (3) – causation – is a steeper hill to climb. On this point, Ford cites *Hunt-Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004 (7th Cir. 1997) for the proposition that a "pattern of criticism and animosity by [plaintiff's] supervisors following her protected activities . . . here supports the existence of a causal link." *Id*. at 1014. Ford claims she has been subjected to a pattern of criticism and animosity, highlighting that: prior to the settlement conference, the CPD emphasized its support for Knecht; following settlement, the Crawfordsville Mayor at the time, Mayor Zumer, stated to the local paper that "[o]ne of the. . . particulars [of the settlement] is that [Ford] is no longer a detective"; Knecht misled the CPD as to Ford's new duties following settlement; and Ford was not furnished with sufficient equipment, such as a car, to complete her duties following settlement. [*See* Dkt. 106 at 23-24].

The Court is not persuaded. Most of these items are either irrelevant or conclusory statements unsupported by the evidence. Moreover, Ford's allegation that she was given inadequate equipment to succeed is somewhat misleading. The parties quibbled over the terms of the July 25, 2007 handwritten settlement agreement until a more formal settlement agreement was executed in November 2007. Apparently, some of this quibbling involved whether or not Ford was entitled to a police vehicle. However, despite her insinuations that the CPD was setting her up to fail, Ford does not direct the Court to any evidence that any of her supervisors or colleagues had ever criticized her job performance. The operative facts remain: (1) Ford was talking on her cell phone; (2) she suggested Knecht may have been involved in someone's firing; (3) Knecht heard this and confronted her; (4) Ford responded by using profanity at the Chief of Police and denying his authority; and (5) a suspension was imposed. The evidence simply does

not support the theory that Ford's complaint filed in February 2007 had any connection to the discipline she received roughly ten months later in December 2007 and January 2008.[6] Moreover, Ford has failed to present evidence impugning the Board's decision to impose a 3-day suspension, and thus cannot establish a nexus between her statutorily protected activity and the Board's decision to suspend her. At bottom, common sense suggests that Ford's disrespectful behavior towards her superior, not her prior complaints, triggered her punishment.

### 3.    Constructive Discharge

As an alternative retaliation theory, Ford contends that she was constructively discharged.[7]  A constructive discharge is an adverse employment action that occurs "when the plaintiff shows that [she] was forced to resign because [her] working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citations omitted).  The Seventh Circuit recognizes two

---

[6]To the extent Ford argues that being required to submit to a fitness for duty evaluation constitutes an adverse employment action, this argument fails. *See Nichols*, 510 F.3d at 787 (collecting cases and affirming summary judgment on plaintiff's retaliation claim; "the Department's placement of [plaintiff[ on paid administrative leave pending the results of his fitness-for-duty psychological examinations did not constitute a *materially* adverse action.").

[7]In her sur-reply [Dkt. 114], Plaintiff, without citing to any cases, argues that summary judgment is inappropriate on her claim of retaliation based on constructive discharge because Defendants' opening brief [Dkt. 98] failed to explicitly mention constructive discharge.  The Court is not persuaded for at least four reasons.  First, Plaintiff's response [Dkt. 106]  thoroughly briefed the issue of constructive discharge, thus alleviating any concerns related to prejudice caused by sandbagging.  Second, Ford filed a sur-reply, in which she was free to address concerns raised by Defendants' reply brief [Dkt. 106].  Third, although Defendants failed to mention constructive discharge in their opening brief, they did move for summary judgment on Plaintiff's retaliation claim.  Fourth, Plaintiff's "gotcha" claim is somewhat curious, in light of her problems with belatedly-filed evidence, which the Court decided were not fatal.  Overall, Plaintiff's technical argument invites the Court to elevate form over substance.  The Court declines to do so.

different forms of constructive discharge, both of which require a showing "that the work environment had become intolerable." *Id.* (citations omitted)

In the first form, an employee "resigns due to alleged discriminatory harassment." *Id.* "Such cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Id.* (citations omitted). For instance, this type of constructive discharge often involves threats to personal safety. *Id.*; *see, e.g., Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (claim for constructive discharge possible where harassment includes repeated use of noose and implied threats of physical violence); *Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188, 1198-99 (7th Cir. 1992) (constructive discharge occurred where supervisor brandished firearm and held it to plaintiff's head). Ford unfurls a litany of reasons why her decision to resign amounts to a constructive discharge, but they need not be addressed in detail here. The Seventh Circuit has held that "[o]ne threat and raised voices would not rise to the level of a hostile work environment, and so it also cannot be the basis for [a] constructive discharge claim." *Chapin*, 621 F.3d at 679 (citation omitted). Some alleged menacing glares from Knecht and general stigmatization notwithstanding, Ford cannot show that her resignation constituted a constructive discharge.

The second form of constructive discharge occurs "when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated," followed by the employee's resignation. *Id.* (citations and internal quotations omitted). However, under this form, working conditions do "not become intolerable or unbearable merely because a prospect of

discharge lurks in the background." *Id.* (citation and internal quotations omitted). Here, Ford cannot seriously argue that she was on the chopping block. She received a 3-day unpaid suspension and was free to return to work after she served this suspension. The December 13, 2007 letter from Utterback specifically stated, "At the conclusion of the suspension, you would return to duty with no further punishment resulting from the incident."

Thus, there was no "handwriting on the wall" suggesting that Ford's termination was imminent or inevitable. *See id.* At 680 (noting that plaintiff's constructive discharge claim must fail because he simply never returned to work, and court could only speculate as to whether or not he would have been fired). Ford's circumstances stand in stark contrast to cases ruling that a constructive discharge claim could move forward. *See, e.g., EEOC v. University of Chicago Hospitals*, 276 F.3d 326, 332 (7th Cir. 2002) (employee arrived at work to find her belongings packed and her office being used as storage); *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 604 F.3d 490, 502 (7th Cir. 2010) (both parties stated that had the employee not resigned, he would have been terminated immediately). Here, by contrast, no reasonable employee standing in Ford's shoes would believe that had she not resigned, she would have been immediately fired. In fact, Ford remained an employee of CPD for over four months after the Board levied its punishment; she did not tender her letter of resignation until late May 2008. Under any standard and from any perspective, Ford's decision to quit was her own. For all of the above reasons, summary judgment is **GRANTED** on Ford's retaliation claims.

**D.      Disability Discrimination Claim against the City**

In a conclusory fashion, Ford alleges that the City violated the Americans with Disabilities Act ("ADA"). Ford's entire argument rests on the statement that the "City [treated]

18

Ford as if she had a psychiatric disability and discriminated against her by the terms of the December 13, 2007 letter." [Dkt. 106 at 30]. To the contrary, there is no evidence that the City regarded Ford as having a disability. *See Kupstas v. City of Greenwood*, 398 F.3d 609, 612 (7th Cir. 2005) (under a "regarded as" claim, employer must believe, rightly or wrongly, "that the employee has an impairment that substantially limits one or more of the major life activities.").

At bottom, without putting meat on the bones of a skeletal argument, the real crux of Ford's ADA count is unclear. For this reason, Ford's response with respect to the ADA claim is inadequate to survive summary judgment. *See Goodman v. National Security Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (summary judgment is the "put up or shut up" moment in litigation because "the non-moving party is required to marshal and present the court with the evidence that she contends will prove her case."). Accordingly, summary judgment on Ford's ADA claim is **GRANTED**.

**E.    Section 1983 Claims against Individual Defendants and the Board**

Ford has brought an array of Section1983 claims against the Individual Defendants[8] and the Board. These claims include: (1) denial of equal protection of law, (2) denial of procedural and substantive due process, and (3) failure to train to prevent the unconstitutional actions of officers.

All three claims fail as a matter of law because the Individual Defendants are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory

---

[8]Ford's failure to train claim was brought against only Zumer, Coons, Knecht, and Utterback.

or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (citation and internal quotations omitted). Whether a government official is entitled to qualified immunity is a legal question for resolution by the court, not a jury. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). The doctrine protects public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). Significantly, qualified immunity covers "mere mistakes in judgement, whether the mistake is one of fact or one of law." *Butz v. Economou*, 438 U.S. 478, 507 (1978).

The applicability of qualified immunity is determined by a two-part inquiry established in *Saucier v. Katz*, 533 U.S. 194 (2001), *modified by Pearson*, 129 S.Ct. 808. First, the court "must consider ... this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?" *Id.* at 201. Second, the Court must decide whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.* The answer to both *Saucier* questions must be in the affirmative in order for plaintiff to defeat a motion for summary judgment on qualified immunity grounds.

Ford's claims fail under both prongs. First, no constitutional violation has been shown. Ford's Equal Protection Clause claim is subject to the same standards as her Title VII claims. *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003) ("Our cases make clear that the same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection."). Therefore, Ford's equal protection claim inescapably suffers the same fate as her Title VII claims. Ford's due process claim is equally unavailing. *See Kivett*, 2007 WL 906470;

*Ellis v. Sheahan*, 412 F.3d 754, 756 (7th Cir. 2005) (stating that "to have and lose an entitlement is not enough to establish a deprivation of property without due process of law. . . [t]he plaintiff had to show that the property was taken away from her without notice and the opportunity for a hearing at which she could try to contest the deprivation").  Here, Ford received a hearing about her punishment and actually had her suspension reduced.  Even taking the facts in the light most favorable to Ford, she cannot show a violation of her constitutional rights.[9]

Assuming *arguendo* that Ford could show a violation of her constitutional rights, such a right was not clearly established.  On this point, it is well-settled that "[g]overnment officials enjoy qualified immunity and are shielded from civil liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Kodrea v. City of Kokomo*, 458 F. Supp. 2d 857, 871 (S.D. Ind. 2006) (citation and internal quotations omitted).   Tellingly, Ford fails to unearth any meaningful precedent in her response brief that would support the notion that her violated constitutional rights were "clearly established."  Ultimately, Ford's shadowy allegations amount to little more than displeasure with the outcome of the Board's hearing.  The Individual Defendants are entitled to qualified immunity and, for this reason, summary judgment on the above counts is **GRANTED**.

## F.      Section 1983 Claim for Failure to Train against City

Qualified immunity would not protect the City from a failure to train claim, however. *See Kivett*, 2007 WL 906470, at *15 n. 13 ("Qualified immunity would not have let the Department

---

[9]Ford also brought a §§ 1983 and 1985 conspiracy claim in her complaint.  However, in her response brief, Ford conceded that summary judgment is appropriate on this count. Therefore, the Court need not address it.

off the hook because local governmental bodies do not enjoy qualified immunity from damages under § 1983 claims.") (citation omitted).  To prevail on a failure to train claim against the City, the plaintiff must show that the City's employees violated the plaintiff's constitutional rights, that the City had a policy or custom of failing to train its employee, and the failure to train caused the constitutional violation. *Roach v. City of Evansville*, 111 F.3d 544, 549 (7th Cir. 1997) (citation omitted).  "In particular . . . the inadequate training of police officers could be characterized as the cause of a constitutional tort if – and only if – the failure to train amounted to deliberate indifference to the rights of the persons with whom the police came into contact." *Id*. (citation and internal quotations omitted).

Ford's failure to train claim is predicated on the fact that, based on their deposition testimony, City officials were not well-versed on Title VII, did not have working knowledge of the CPD's specific policies regarding harassment and discrimination, and did not conduct substantive training on these issues.  Moreover, according to Plaintiff, the City officials "dug their heads in the sand" and were "deliberately indifferent to the federal laws governing employment by failing to establish a human resources department." [Dkt. 106 at 33-34].  The Court is not persuaded.  As discussed above, no constitutional violation took place.  It necessarily follows that a failure to train claim – anchored in a purported constitutional violation – must fail.  And, even if a constitutional violation occurred, there is scant evidence establishing that a failure to train *caused* such a violation.  For these reasons, summary judgment is **GRANTED**.

G.      **State Law Claims**

Finally, Ford lodges numerous state law claims – including false light, invasion of

privacy, intentional/negligent infliction of emotional distress, and wrongful termination – against various Individual Defendants.  After Defendants pointed out that all such claims were time-barred by the notice requirement of the Indiana Tort Claims Act ("ITCA"),[10] Ford conceded the day on these claims, with a caveat.  Specifically, Ford argues that the time limits of the ITCA do not apply to claims for intentional/negligent infliction of emotional distress and wrongful termination against Knecht in his *individual* capacity – "separate and apart from his [identity] as a member of the CPD."[11]  This argument is belied by Ford's own deposition testimony, in which she testified that she sued Knecht in his "capacity as chief of police" and "because of [his] association with the [C]ity of Crawfordsville in dealing with [Ford]."  Accordingly, Ford's state law claims against Knecht are, like her other state law claims, time-barred. *See VanValkenburg v. Warner*, 602 N.E.2d 1046, 1048 (Ind. Ct. App. 1992) (the notice requirement of the Tort Claims Act applies not only to political subdivisions, but also to employees of political subdivisions).  For this reason, summary judgment on all of Ford's state law claims is **GRANTED**.

---

[10]Ford failed to provide notice to Defendants within 180 days after the loss occurred as required by the ITCA. *See* Ind. Code § 34-13-3-8.

[11]The Court rejects this argument as it is difficult to conceptualize how Knecht could have "terminated" Ford "separate and apart"from his membership in the CPD.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment [Dkt. 97] is

**GRANTED** in its entirety. All other pending Motions [Dkt. 112 and Dkt. 116] are **DENIED** as

Moot. A separate judgment shall accompany this entry.


SO ORDERED:  02/28/2011

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana


Copies to:

**John S. Capper , IV**
CAPPER TULLEY & REIMONDO
bmitchellctr@sbcglobal.net

**Stephanie Lynn Cassman**
LEWIS WAGNER LLP
scassman@lewiswagner.com,gbrackett@lewiswagner.com

**Ellen M. Corcella**
CORCELLA LAW, P.C.
corcellasolutions@gmail.com

**Robert R. Foos**
LEWIS WAGNER, LLP
rfoos@lewiswagner.com,rlitzelman@lewiswagner.com

**Theresa Renee Parish**
LEWIS WAGNER LLP
tparish@lewiswagner.com

**David S. Peebles**
HARRIS HARVEY & PEEBLES LLC
dpeebles@hhplawoffice.com,roxie@hhplawoffice.com